Good morning and welcome to the United States Court of Appeals for the Third Circuit. We're glad you're here. And we will hear our first case, Coons v. Atty Gen 23-1900 and Siegel v. Atty Gen NJ 23-2043. You may proceed. Thank you, Chief Justice Harris, and may it please the Court, Angela Kai for the State of New Jersey. I'd like to reserve five minutes for this. That will be granted. The Supreme Court thrice confirmed in Heller, McDonald, and Bruce that something about the copious history they reviewed cast doubt on the constitutionality of longstanding laws prohibiting firearms at sensitive locations, such as schools, government buildings, and the like. That is because the totality of this nation's history, from the colonial era to Reconstruction and beyond, confirms that legislatures could ban firearms at such locations. In Chapter 131, the New Jersey legislature identified modern locations as sensitive and limited firearms except those carried by law enforcement and those authorized to provide security. The history supporting that democratic decision is cut from the same cloth as the history supporting restrictions at schools, courts, polling places, and legislatures. Here, throughout the 1700s and 1800s, dozens of legislative bodies around the nation restricted firearms at identical or analogous locations to Chapter 131. That includes fairs and markets of the founding era, ballrooms and parks in the antebellum period, and schools and zoos and theaters and more immediately after states ratified the 14th Amendment. Importantly, plaintiffs cannot identify a single court or a legislator or legal scholar or even lay commentator who contemporaneously doubted the validity of any of these historical laws. In fact, state court decisions cited favorably by both Heller and Bruin reviewed these laws and found them consistent with the individual right to bear arms. That is precisely the kind of historical tradition that makes the cut under Bruin. To be sure, modern regulations could flunk Bruin's test if no historical legislature adopted an analogous law when faced with the same enduring social problem. Modern regulations could also flunk Bruin if historical courts struck down their historical predecessors. But where history and tradition point in only one direction, as they do here, we must assess the destination. Plaintiffs' arguments are simply incompatible with Supreme Court's instructions. First, against the state's 30-plus historical park restrictions or 10 historical laws banning guns at places of entertainment, plaintiffs insist that these historical precursors weren't identical enough or came too late or weren't universally adopted. But those arguments would require defying the Supreme Court's thrice-repeated statements about schools and government buildings. After all, at the founding, there were no firearm bans at schools, and any such bans at legislatures, polling places, and courthouses were sparse. Second, plaintiffs' argument requires that this court accept that the mere lack of an affirmative regulation at any given point in time would forever cabin legislative decisions in the future. But the Supreme Court's most recent decision in Rahimi teaches us that it's incorrect. The Second Amendment is not so short-sighted so as to leave us with only a menu of laws trapped in amber from centuries ago. And as Justice Barrett warned, federalism is incompatible with use-it-or-lose-it constitutionalism. Third, plaintiffs argue that only places with government-provided metal detectors could be sensitive places. But history shows nothing of the sort, and that theory would eviscerate longstanding polling place restrictions across the nation or restrictions at locations like daycares or nursing homes. It is telling that no other court has agreed with this theory. Fourth, plaintiffs' in-local parenthesis theory about schools makes little sense. The Supreme Court thrice named schools as a paradigmatic sensitive place for prohibition of firearms. It did not single out students as a cause of people who could not have firearms. Instead, following Rahimi's principle-based rule means the historical tradition from firearm restrictions at schools amply justifies Chapter 131's regulations at playgrounds, youth sports events, and designated children's areas of public libraries and museums. Luckily, four other courts of appeal to consider sensitive places restrictions post-Bruin have rejected plaintiffs' arguments. And as this Court has repeatedly stated, it should be reluctant to contradict the unanimous position of other circuits. Fidelity to that principle and fidelity to the Supreme Court's teaching means that courts reject plaintiffs' facial challenge. I welcome this Court's question. Thank you. You mentioned history rather generally, and I'm afraid we're going to have to get a little more granular on that. You argue in your brief in various places, in particular your reply brief at page 18, that in the event of a clash between founding era and Reconstruction era historical analogs, that the latter ought to control for purposes of our inquiry under Bruin. Doesn't Bruin tell us something different? Doesn't Bruin tell us that we should treat evidence from the late 19th century as having minimal probative value when it conflicts with earlier evidence? I'd be interested in your position on that. So, Your Honor, I think I would urge this Court not to overread references in Bruin as saying it has to be evidence from 1791 or 1868, because Bruin and Rahimi explicitly said they were not deciding that very interesting academic question. All this Court needs to do is do what the Supreme Court said was appropriate. Well, if I could just quote it. The opinion says on page 66, late 19th century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence. Isn't that rather specific? I think that is important to understand because it's qualified. It's insufficient when it contradicts the overwhelming weight of other evidence. So the Court said that in reference to the single Texas 1871 statute that was all publicary because, quote, a single law in effect in a single state that contradicts the weight of other evidence is insufficient. And that other evidence included not only founding era or rather antebellum cases that went the other way, but also other cases from that time period that also went the other way. We don't have that here. You will not find a single case that a plaintiff has cited from either the founding period or the antebellum period or Reconstruction that says restrictions at sensitive places in many jurisdictions adopted them would have been unconstitutional. In fact, you have decisions like Andrews, the Tennessee 1871 case that Heller cited three times and Bruin cited once positively for the idea that it recognized an individual right to bear arms. In Andrews, the Court said that is true, therefore you cannot have a total ban on carrying a firearm. But it also said unequivocally that restrictions at places, sensitive locations like public assemblies and the like were constitutional. So I think those cases like that case as well as Shelby, the Missouri case also cited by Bruin positively is going the same direction. It is not what Bruin was looking at, which is one law that was then contradicted by other evidence either earlier or contemporary. Speaking of overriding Bruin, should we really be overriding Heller's colorful use of the phrase sensitive places as actually creating a doctrine? It strikes me as similar to, I don't know, large capacity magazines or assault weapons as a regulatory term that can be applied to anything that a regulator wants to regulate and then used as a claim for historical justification. So do you really think they were intending to create that, particularly when Bruin says, well, we don't need to define the needs and bounds of that reference? I do agree with you, Judge Meadey, that I don't think the Supreme Court defined the needs and bounds of what are sensitive places and what are not. And I think Bruin was pretty explicit that it's just an example or a set of examples. But I will suggest that it is not just a stray line type of dicta. It was said first in Heller. It was repeated as an assurance in McDonald when the court understood that it was now applying the Second Amendment to all states. And in Bruin, it was repeated for a third time as a paradigmatic example as the court was trying to explain to the lower courts how to do the history and tradition analysis, not for the first time, but for the second time. But it's never been defined, right? And I understand at least one example of what it means could be places where government provided comprehensive security, right? And so we would know that that courthouse, a military base, these are places where going armed was severely restricted. I mean, isn't that a helpful way of thinking about this? I'll note that that argument has to be based on history, and the history is just not there. So I think we're all trying to do what Rahimi taught us to do, which is define the historical principle that undergirds all these historical analogs. And so, Counselor, on that, the New Jersey law right now has a pretty comprehensive list of sensitive places. What is the state's position on public locations that could not be regulated as sensitive places? What falls outside? I think there's a reason why historical legislatures never chose places like bakeries and individual shops as sensitive places. Why is a bakery different from a zoo or a library? Because it's not. So zoos and libraries were understood as locations where people gather for literary or scientific purposes. So that's not the case for a bakery, as far as I can tell, right? So those are statutes that Texas and Missouri and other courts that had Second Amendment analogs chose as locations to deem as sensitive. So you're telling me there's a constitutionally significant distinction in the Second Amendment between a bakery and a zoo or museum? Yes, and that is grounded by history. Because of the Texas state statute and how Texas defined it at one point in time. Texas was just one example. We've had a number of other examples, including specific restrictions at zoos as soon as they came into existence, which they were all inside parks. And those parks generally prohibited firearms in them as well. Very purposeful. So if a bakery and bakeries in the states are being used for book clubs, literary meetings, now all of a sudden the ban can apply? I think that's a question that hasn't been presented to us. I don't think a bakery in general is used just because it can be sometimes used as a location for X purpose doesn't mean that it is a sensitive location. I think it has to be designed and dedicated to that purpose. So I don't think that necessarily applies. In addition to bakeries in New Jersey, where else can people possess firearms without them being regulated in sensitive places? Sure. So any number of commercial establishments, banks, coffee shop, pizzeria, grocery store. Banks? I mean, a bank seems like it creates more security issues, doesn't it, than a public library? So as far as I understand, there's not a specific historical tradition of prohibiting firearms at banks. And that is why New Jersey has not regulated firearms at banks specifically. What's the national historical tradition of banning firearms in schools? That's a really good question, Judge Porter. So the history as we understand it from both looking in this case and at the sources that Bruin cited, the first time you will see a location-based restriction for all who enter a school are the same historical citations that we cited for other locations, like entertainment and literary gatherings and things of that sort, that started, we believe, in Texas in 1870, but was repeated by Missouri and many other jurisdictions later on. There were student-based restrictions at certain universities in the 1820s and 30s and so forth at individual schools. So you could look at that. Imposed by the schools themselves. Correct, correct. Does that count as part of our national regulatory tradition? You know, I think you can look at it in context and say that's an interesting thing that some schools chose to do, and perhaps they were concerned by some of the same issues that the Texas legislature and Missouri legislature was concerned about and chose to go at it from a different policy perspective. But the fact that they didn't choose a different regulatory tool, a sense of place restriction, at any given point in time, doesn't mean that they were saying that's unconstitutional as a matter of Second Amendment. In fact, I think some of the schools that chose those student-based restrictions wouldn't have been bound by an understanding of the Second Amendment in the time when they chose those decisions. So it's not the Second Amendment that was stopping them. It was policy decisions, and federalism requires that different states and different institutions within the states be able to choose what policy decisions fit the democratic purpose. And Bruin and Rahimi are concerned about state action, right? Correct. If you have a scenario where there is silence in the legislative record, where does the court go to figure out if there's some kind of tradition? For example, do we look at the common criteria, objective criteria, that the four locations that the Supreme Court has on multiple times identified guide our efforts to try to identify a tradition? Or is that irrelevant and we're stuck with what the legislative record would be, the regulatory record would be? I think you would have to first look at whether there is a natural explanation for the silence as important relevant context. So if you have, for example, a longstanding acute social problem that, if you are looking back to 1800 or 1850 or 1868, that those legislatures understood was a huge problem for them. And if none of them chose to regulate that problem with any kind of firearm restriction, and that would have been the natural thing to do, and perhaps especially if it was written about as something that is a problem, and perhaps the firearm restriction was debated and they chose not to do so, I think that is relevant. I don't think it's dispositive, but I think that's relevant evidence. And if we had that in this case, I think we would have a much harder time. But you don't have that here. The locations that we're talking about either were regulated in some form at some point in the first decades of this nation's history, and especially after the social problem became acute. So we discussed in our briefs, and I think a lot of the historical evidence bears this out, that before 1850 or the 1840s and 50s, the commercial market for handguns was really just very, very small. And in fact, Samuel Colt himself had a hard time establishing a commercial base. It wasn't until the Colt revolver patent expired in 1850 that these relatively easy-to-obtain cheap revolvers started flooding the market. And there may be other historical reasons why people started getting them, but then you start reading about interpersonal violence, riots, and other kinds of social problems emerging, especially in the Reconstruction South. And the radical Republicans in Texas and other states that wanted to deal with this problem, especially as it related to suppression of people's right to vote, including freed slaves' right to vote, then enacted these restrictions. And a lot of them, in fact, were in states that had a Second Amendment analog to the individual right to bear arms. And it happened exactly also at the time when the Second Amendment became incorporated against the states through the 14th Amendment. But can I ask you about just – and I'll yield the floor. These are smaller items, not the sensitive places. It goes to the insurance requirement and the fee. You are in a preliminary injunction setting. We're looking for irreparable harm. Dollars are being spent if these laws were enacted. Is the state forgoing a sovereign immunity argument as it relates to compensating the expenditure of these funds should these statutes ultimately be deemed unconstitutional? Yeah, so two answers to that. So as to the insurance provision, I think it's not the case that every time a person, a litigant, stands to lose $1 or $50 that it suddenly translates to irreparable harm, even if there is no cause of action or some other doctrine may prevent them from recovering that money from the state. If that's true, then you have preliminary injunctions in all kinds of cases where there is no defined path to collection. And as to the fees, it's interesting because the irreparable harm has to be geared towards their legal theory and not just the amount of money they happen to be saving as a response. Plaintiffs never argue that the $200 fee, which just accounts for the rate of inflation since 1970, is something that they couldn't afford or is not the right number. Their only objection is where $50 of that $200 legislature in one year has decided to allocate to a certain fund. And the record is unclear exactly how that all works, correct? I don't think you need a record because a binding New Jersey law… It's your court, though, at that point. Yeah, there is a binding New Jersey law that, with all respect to the legislature who enacted that provision, that does not bind future legislatures as to where money in the budget goes. So I think that even putting that aside, their only objection to it is where the money goes. I'm aware of what their objection is. I'm asking you a different question. It's a monetary relief, and the question I have is whether or not this is the kind of relief that should be subject to a preliminary injunction. And as I understand from the briefing, sovereign immunity was sort of discussed by the other side as an impediment to relief. And that was my question. Is there an assertion of sovereign immunity as a bar to recompensate them for the monetary amounts in those two areas? Thank you, Judge Ross. Yes, the state is not waiving sovereign immunity. We're just suggesting that not every time you stand to lose a dollar or two that that suddenly becomes irreparable injury. Thank you. Judge Krause? Thank you. Ms. Kaye, I'd like you to assume that notwithstanding the Supreme Court authority you cited, that this court concludes that laws after 1791 have minimal, if any, relevance as historic analogs, even when there's not a conflict. Under those circumstances, do various sensitive places in the list that New Jersey has generated no longer qualify? Or are concepts of a fray and terrorizing the populace dating back to the founding sufficient analog for those locations? Can we think about analog at even that level of generality? I think you can. I will make one observation first before I get to the thrust of your question. If you make that assumption, then it cannot be that courthouses or schools can be sensitive locations. Because I am not aware of any statute pre-1776 or enacted by a colonial legislature that prohibited firearms at schools or courthouses. And you only have one state that did so at legislative assemblies, and I'm aware of only one at polling places, and that's Delaware. So that's just the outcome, if that is the methodological angle that we're taking. But with respect to your question, I do think that you could look at the Satcher-Northampton as it was understood by the people in the colonies and immediately thereafter. And the Satcher-Northampton has at least two different components. So it is true in Bruin, the court discussed that the component that says that nor bring no force in a fray of the peace is a qualifier on all blanket restrictions on public carry. So in order to prohibit public carry, you have to have that qualifier because it was understood in the Satcher-Northampton as a qualifier. It can't be that if you're just going about for self-defense and you're not acting in a fray or breach of the peace that you could restrict that. But there is a separate line that says nor to go nor ride armed by night nor by day in fairs, markets, nor in the presence of justices or other ministers. That is the sensitive place history and tradition that started with the Satcher-Northampton that justifies restrictions at courts in the same breath as restrictions at fairs and markets, all the same clause. And so when it was codified in states like Virginia in 1786 and in North Carolina in 1792, that same fact is true. There are different clauses for the fray clause and sensitive place clause. So you could use the fairs and markets and courts as its own tradition and analogize from there, and that's perhaps how you get to schools as sensitive places because they are places where people who are – where if you have an even self-defense discharge or display of a firearm, that may cause more harm to the people gathered there because of the state that they're in or because of the social activities going on there. If you were to just look at the fray clause on its own, I think there is some theory that I don't think has been well briefed here, but let me offer it here, that in a fray would automatically be the case if a firearm is even used in self-defense at these particular locations. And then you could then analogize from there if that's true at fairs and markets and courthouses in 1786 or 1700 whether or not that is true at locations today. I don't think you need to do that because at no point in any of the Supreme Court's cases have they said you can only look to history that predates the founding. You don't see that in the cases that we cite or plaintiffs cite in Gamble, for example, on the double jeopardy clause and the meaning thereof. The Supreme Court said you don't have a lot of cases where both sovereigns prosecuted an individual for all kinds of reasons before the mid-1800s. And so then they look to cases from 1840s and onward up until 1922 to understand the meaning and the application of the double jeopardy clause. Here, for different reasons, there was no particular social problem that many legislatures saw before 1850. And so that's the same reason why we look to cases from the late 1800s when, by the way, a lot of states started enacting their own Second Amendment analogs. And at that very moment, those very states, like Missouri and Tennessee and Texas, also started enacting sensitive place restrictions. Courts then passed upon them and said these are constitutional. And so I think in terms of history, we have an exceedingly robust history of a history tradition of legislative experimentation with particular places. And the fact that some legislatures chose to go right up to the constitutional line and some legislatures did not, I don't think it's indicative. What is the new social problem that was identified? Would you say it's the presence of guns where people congregate? How do you define that new social problem? In the 1870s? So I think it's a couple of different things. So people bringing firearms to daily life, the activities of daily life, I think was a problem that they saw. And you see that in the history in the record. How they solved that social problem was not to generally prohibit firearms everywhere but to locate specific locations where these problems are particularly acute. At places, for example, where designed for civic and democratic participation, locations designed for the needs of vulnerable people like students and the inebriated, and then places where the presence of firearms, even among the law-abiding, could really jeopardize the safety of others. Why is that a new social problem that had never been contemplated before? Isn't that exactly the kind of thing that was addressed by the statute of Northampton going back 600 years? I see my time has expired. Go ahead. You can answer the question. I do think that legislatures, some legislatures may have recognized and paid attention to that social problem. I think it became a much bigger social problem when people were carrying handguns with them more frequently after the 1850s. You see cases like Huntley, the North Carolina case that Heller cites. It talks about how you have a general right to self-defense, but it also observes, as a matter of sociological fact at the time, that nobody goes around carrying firearms. And that's sort of like an unseemly thing to do. And if people weren't doing it because of social mores, then legislatures, including legislatures that were not bound by the Second Amendment or any state analog thereof, chose not to enact those laws. And I think the decision of our friends in Delaware in the 1800s not to restrict firearms at theaters and performances shouldn't and couldn't in a federalist system bind the decisions of Pennsylvania in 1870 or New Jersey in 2022 from enacting a restriction like that just because one state did not choose to do so. Thank you, Cassie. We'll get you on rebuttal. We'll hear from the Siegel plaintiffs. Ms. Murphy. Good morning, Your Honors. I may have pleased the court. My name is Erin Murphy on behalf of the Siegel plaintiffs. Bruin made clear that states may not impose ahistorical conditions on those seeking a permit to carry a handgun for self-defense. And while Bruin acknowledged that the Second Amendment allowed states to prohibit firearms in certain sensitive places, it went out of its way to make clear that the historical record revealed relatively few of these, quote, of sensitive places so broadly as to eviscerate the general right to publicly carry arms for self-defense. Rather than heed those teachings, New Jersey's response to Bruin largely defies them. The state has conditioned the exercise of the right to carry a handgun on the ability to produce four reputable persons willing to provide a written character endorsement and sit for a follow-up interview. It has imposed a novel insurance mandate that treats law-abiding citizens as blocking liability risks simply because they want to exercise their Second Amendment rights. It has imposed an application fee that forces law-abiding permit applicants to shoulder costs generated by violent criminals. And it has declared nearly the entirety of New Jersey sensitive places that are off-limits to the carrying of handguns, even by those who are fortunate enough to secure a carry permit. Any definition of sensitive places that sweeps so broadly as to encompass parks, museums, beaches, libraries, entertainment facilities, public gatherings, all modes of transportation, and more, is the epitome of a definition so broad as to eviscerate the general right to carry arms for self-defense. Now, while New Jersey has taken a blunderbuss approach to identifying sensitive places, we haven't responded in kind with a blunderbuss attack. Of the 25 categories that New Jersey has identified, we've actually challenged at this point fewer than half of them, and we aren't even challenging each of those categories in their entirety. And that's because we don't take issue with the proposition that there are certain places where handguns can be prohibited consistent with historical tradition. I think it's common ground that there's a category of places where core, deliberative, sensitive functions of government take place, the courthouses, the polling places, legislative assemblies, et cetera. We also don't take issue with provisions that are focused around pieces that have physical attributes that make a firearm a safety hazard in the same way that historically there were laws to deal with when gunpowder posed a safety hazard. So, for instance, a provision here that deals with power plants where the presence of a firearm might cause an explosion independent from concerns about criminals misusing them. We also don't take issue with the notion that the state can have prohibitions in places that are dedicated to housing individuals who are themselves dangerous and not allowed to carry firearms. So there's several provisions in this law that deal with things like correctional facilities or things like certain types of mental health facilities, certain types of perhaps drug addiction facilities. The through line, though, among those categories is that they tend to be places where you have either or both of restricted access and heightened security because of the recognition that they aren't like parks and zoos and museums and libraries, but rather are the kinds of places where you have dangerous activities, important activities, sensitive activities, dangerous people, qualities of the physical property that are dangerous, things that call for treating them as sensitive, not just for purposes of carrying a firearm, but more generally. And so if the state stays within those bounds, we don't take issue with the idea that there are places where firearms may be prohibited. What we very much take issue with is the notion that firearms may be prohibited essentially anywhere where people congregate, whether they are congregating to engage in First Amendment activity, civic activity, recreational activity, to watch a sporting event, to watch some theater, to just take your kids out for a day at the park, whatever it may be, anywhere that people seem to gather, which seems to be the state's approach. If that were the law, we would have seen, as a matter of historical tradition, we would have seen far more than four laws from four states in the 1860s that took the approach of imposing these kinds of broad prohibitions. Instead, what we saw as concerns about things like handguns arose in the 1800s are concealed carry restrictions. Even some of the laws the state is relying on here were concealed carry restrictions, not efforts to say, oh my goodness, now that there's handguns, we're not going to allow anybody to carry firearms anywhere. The few jurisdictions that took that approach are the exact same jurisdictions, for the most part, that Bruin already said were taking outlier approaches to the right to carry generally, which makes them a very poor place to look to understand the tradition surrounding what could be deemed a sensitive place. Today and in your briefing, you seem to limit your challenge to playgrounds and youth sports events to sort of off-campus locations. Do you concede that Chapter 131's restrictions on playgrounds and youth events could be constitutional insofar as they take place at schools? And if so, how does that affect your facial challenge? This stems from how we understand the law. We think that if they're taking place on school property, they're already covered by the school provision, which we're not challenging. So we understand these separate provisions about playgrounds and youth sporting events to be there precisely to capture anything that's happening not on school property. So our challenge is confined in the sense of how we understand those provisions to be confined, which is why I do think as to those particular provisions, it is a facial problem independent from – you know, we certainly have a debate about the constitutionality of limitations on schools themselves. If I could just follow up on that. Assume you have a school that – it could be an environment center or whatever – that the field where practices take place and the games take place are actually located in the town's park. So if it had been contiguous with the school, your position would be that would be a place that could be restricted. But is your position simply because it's located off the school grounds, it's no longer protected even though the same activity is occurring? I mean, that's ultimately the scope of our challenge. I do want to be clear. I mean, we haven't challenged schools. That's not because I'm going to stand here and concede that everything about a restriction on schools is necessarily constitutional. We chose not to press that in this case. I think the Supreme Court, you know, has mentioned schools without providing much guidance at all about exactly what they mean by that, if they think it's students, if they think it's the whole property, if they think it's teachers, all of that. And I'm happy to, you know, discuss our views on that, but to the extent we have a distinction here, it's a distinction that's grounded in the provisions we chose to challenge, not necessarily because I'm here to tell you I think that there's a radically constitutionally significant difference if you have the park kind of off the school property versus on the school property. And so what's the distinction that you're drawing because it's open and not on school premises? Well, I think what I was just suggesting is I'm not necessarily trying to tell you there's a constitutional distinction. I'm telling you that just because we didn't challenge the school's provision doesn't mean we don't think that it might be a little bit overbroad. So what if – I'm going to go back to following up on Judge Chigaris's question. The activity in the park that happened to be school-sanctioned practice. Sure. Is that – and it's not youth. It's high school. Sure. We would be challenging – we're challenging this provision even if it's school-sanctioned activity that's going on because we don't think the fact that activity is happening somewhere that's sanctioned by a school necessarily translates into converting that place into a sensitive place. And I think that if you look at the tradition about schools, as the laws that were suggested by the state here, tend to be provisions that were focused on dealing with students while they're on campus engaged in school activities. That's an horrendous tradition. We could have a debate about exactly how broadly that goes and at what point you're no longer in loco parentis if you are, if you're not, if you're engaged in school-sanctioned activity at a park. But I think that by virtue of the way that the state has set up its law, that that's probably outside the scope of our challenge since I understand the provision we're challenging to be there to kind of deal with situations that are not part of school activities. Thank you. Ms. Murphy, you identified as one category of location the physical attributes that would make the firearm a safety hazard at that locale. So I don't think there's been any debate that there's been significant technological changes in the decades since the founding. And we have firearms now that, for example, in Dayton, Ohio, killed nine people, injured 17 in 32 seconds. Why in that circumstance is it unreasonable for a legislature to make the determination that the presence of firearms where it terrorizes people, where the public that's there they anticipate may overreact or even law enforcement overreacts, leading to violence, to use those locations as sensitive places? Why doesn't that fit into your category of those locations that have the attributes that would make a firearm a safety hazard? Sure. So I want to offer two responses. First, just to be clear about the scope of what I have in mind when I'm talking about physical attributes. I mean the physical attribute in the sense that there's something at the property that makes it likely to explode or makes it more likely that you're going to have a fire or that kind of safety risk that generates in the same way that there were concerns about where you could have a gunpowder factory. But not that there would be a stampede or that other people may blow up a fire. Just to be clear, that is not what I mean by physical attributes. And I think the concern with once you start defining it the way that you have suggested is I'm not sure where there's any limiting principle. I mean you necessarily end up reaching any place where people congregate in significant numbers. That is precisely the argument that New York made in Bruin. They said, look, times have changed. And we have way more people around today. New York City is an incredibly populous place. If we have firearm violence there, it's going to create massive problems. And we have a police presence around today that we did not have at the founding. So times have changed in a way where we have to have, and this is a sensitive places argument that they made. We have to have a different conception of sensitive places. And the Supreme Court specifically rejected that argument and said, if you define sensitive places at the level of places where people congregate and there's a police presence, then you have eviscerated the right to carry. And I think that's the problem here. We see that in practice with the way this law operated. Because once New Jersey started with the conception of, well, we don't want firearms in places where there's people, where there's a significant number of people, you end up with a laundry list that, I mean, to be fair, it actually covers bakeries because the state law says all private property even is a sensitive place unless and until somebody says we will allow you to carry here notwithstanding that it's a private property. So you end up with a definition where the last time you were before this court when asked the question, the state said the only place you could carry is on the streets. It can't be that sensitive places is a concept so broad that it covers everywhere outside the home that people actually go. Every one of the circuits that has upheld their sensitive places laws has used approximately the same four categories and defined it in terms of the particular attributes of those places. In the majority panel opinion here, we formulated it as a discrete location set aside for particular civic functions where the presence of firearms was historically regulated as jeopardizing the peace or posing a physical danger to others. Why doesn't that put bounds on the types of places that would fall within the sensitive places doctrine? I mean, I think the proof is a little bit in the pudding. The discrete locations are everything from parks, beaches, museums, libraries, entertainment facilities, anywhere where people are engaged in a public gathering, people at movie sets. Virtually anything you can think of is a discrete location. I think that the concept of discreteness has kind of crept out of what we're talking about. But I would like to talk a little bit more about the specific history that's being relied upon by the cases that have gone that way, which notably do happen to be courts that got reversed in Bruin. But I think that the historical analysis is not really being faithful to the history. And I'd like to give you a point in particular. The state brought up the Northampton laws and the way in which they have kind of two components to them. Well, the state left out the fact that Virginia's law, actually, the way it has a distinction is by saying that the restriction on fares and markets applies only if you are carrying to terror and terror of the country. That's how these were set up. But the distinction they drew is to actually say, on the one hand, you can't carry arms at all. In the courts, before the ministers of justice, you cannot do so at all. Virginia's 1786 law is a good example of this. And then it says, on the other hand, nor can you ride armed by night nor by day in fares or markets or in other places in terror of the country. And that is the tradition that came to this country. That is specifically, again, an argument that Bruin confronted because New York pointed to these same laws and said there's no right to carry generally because it's a ban. And fares and marketplaces, which were the principal places that people went historically, these Northampton laws show that you couldn't carry historically. The court didn't distinguish those laws by saying they were actually sensitive places laws that treated fares and markets differently. It said that New York fundamentally misunderstood how those laws operated. And what they actually did is prohibited carrying in those places only if you were doing so with malintent or carrying dangerous and unusual weapons. So the court has already considered and rejected the argument that Northampton-style statutes reflect a tradition of prohibiting carrying in places like fares and marketplaces. And that leaves the state really having to rely on four state laws and a couple of territories, all coming after 1869, two of which are the same states, Texas and Tennessee, that the Supreme Court said in Bruin had outlier approaches. The three territories are the same territory that were considered in Bruin and rejected. And in fact, the argument in support of those territories is worse here because the laws at issue were laws. They're the same laws. So in Bruin, Bruin considered the part of them that banned carrying entirely and said that's not relevant at all. There's not a separate sensitive places restriction. What those laws did is they banned carrying entirely and in those territories imposed a heightened penalty if you carried in certain places. So they're not even relevant because banning carry was not consistent with our historical tradition. They seem to be even less relevant when you're pointing to them as evidence of how states were deciding where you could and couldn't carry if you're talking about a territory that said you couldn't carry anywhere in the first place. Thank you for going through the historical examples. But going back to just in general the category of sensitive places and how you all would suggest defining it, I want to pick back up on some of my colleagues' questions about the school doctrine versus the playground. And I know that you said the contours of your challenge are partly governing what you think the distinctions are or aren't there. But if we look at other things that are outside of the traditional public school or institutional setting like ballet schools, sports academies, things that are recreational like a park but outside of the school setting, maybe that example could help us understand what you think is the constitutionally significant distinction, if anything, between the kinds of regulations you would think might be appropriate at a school and what's inappropriate about designating a playground as a sensitive location. Sure. So I think there's a couple different ways to think about it. One is if you're focusing on the in loco parentis tradition. And if that's the justification that the Supreme Court has in mind for schools, then I think it necessarily does not reach really beyond – it's certainly not going to reach parks. You're not – your parents are probably in control of you at a park, not a school. You're not in the custody of a school. Perhaps there are going to be situations where you're dealing with – But a camp. A camp. A camp. But, again, the in loco parentis doctrine is going to focus on the students or the children or whoever is in custody. It's not going to focus on the adults who are there engaging in the activities, who we're focused on. I mean, we're certainly not here to assert a right for children to be carrying firearms at parks. It's about their parents being able to carry them to protect their children when they're at a park. And so I think if the in loco parentis doctrine is what the court has in mind, the Supreme Court, then it doesn't reach really the types of carrying that we are focused on. If the court is thinking about it more from the perspective of, look, schools are a somewhat closed environment that you could think of, as I was talking a little bit before, about places that have more restricted access where you're not really supposed to be coming in off the street and that if you have limitations on the ability of the public to be somewhere in the first place, that may provide greater latitude for imposing restrictions, given that you have children there who are not themselves entitled to carry firearms. And so I think if the court is thinking about it more from the perspective of, well, if you have a child in a rec center that maybe has a security guard in the middle of the city, that would be a sensitive place. I don't think it would be. I don't think it would be because it's not a place that is dedicated to, you know, it's not like all you do at a rec center is only have children present. And I don't think the mere presence of a security guard is what makes all the difference between whether something is sensitive or not. I think it would have struck the founders as pretty extraordinary to think that the way to eliminate your right to carry a firearm is by ensuring that lots more government actors were carrying firearms. So I don't think that really can be the whole distinction. I think it's relevant in the sense of if the government is treating a place as the type of place that needs heightened security, that tends to show you that there's something going on there that may be more in the vein of sensitive activities or housing dangerous persons or physical attributes of what's, you know, the activities there that make the place a sensitive place. Judge Freeman. Yeah, I have a couple questions for you about your facial challenges. I know you said that you challenged fewer than half of the list of places that New Jersey has designated as sensitive. But is your facial challenge as to each numbered subsection individually, like you have a facial challenge to, for instance, subsection 11? So some of them are to the provision in their entirety, and some are as to certain applications. And one good illustration, I mean, actually I'll give you two illustrations. Like for one, the zoos is in a provision that lists multiple things. We're only challenging zoos in that provision. So it's a facial challenge as to zoos, but not as to the other things in it. And then what allows you to have a facial challenge to just a part of a statutory provision? I think, I mean, as long as you're singling out something that is a facial component, I don't think we have to challenge four items in a list of four to be able to challenge one of them facially. We're not asking for that provision to be invalidated in its entirety. We're only asking for the restriction as to zoos to be invalidated. So what about the example of playgrounds? Are you saying that you've excluded from your challenge playgrounds that are on school grounds? I want to be clear again. It's not that we've excluded them from our challenge. We don't understand the provision that we're challenging to cover them. We understand playgrounds on schools to be covered by the school's provision that we're not challenging. So it's not that that's an as-applied aspect of our playgrounds challenge. It's that I understand New Jersey to have added a separate provision for playgrounds to ensure that it also reached playgrounds that are not covered by the provision that already deals with school property. Okay. So all of your comments about the youth sporting events and recreational activities, where you are not excluding them, you think that if they are on school grounds, they are otherwise covered by the school? They are already covered by the school. That is how we have always understood the statute. We've said that in our briefs multiple times, and I take the state to agree with us, that that is the right way to read the statute. And so we are only challenging the provisions that are there to reach things that are not happening on school property.  Yes, exactly, exactly. Could you, following up on the facial challenge question, for maybe like the insurance or the four reputable persons, if the law had been drafted, if you have a prior conviction, you know, for harming someone or a negligent finding for accidentally shooting someone, if it were confined to that group of people, would it be a constitutional application? I mean, I'd have to like think a little bit more about it because that's just not the law the state wrote. But, you know, if you – But I'm just trying to understand – Yeah, and I guess, you know, to the extent you're suggesting that that would be enough to defeat a facial challenge, I mean, that's just not really – I've never understood facial challenge doctrine to mean that if you can come up with like a completely different law the state could have written and shoehorn that in, then your facial challenge fails. Because the whole point of this law is to say, no, you have to pay the fee. We don't care if you've ever done anything wrong. You have to pay the fee anyway. And so to say all the people who've never done anything wrong can't get any relief because maybe there's someone out there who did do something wrong, you know. I'm just trying to understand if there is a constitutional application of an insurance requirement based on the analogs asserted. Yeah, and I just – to be like very precise in my language, I don't think there's a constitutional application of this statute. There may be a constitutional statute that could be written that is designed to deal with people who actually have – you know, that fits more into the tradition of surety laws. It says if you've engaged in misconduct, then we can impose different restrictions on your ability to carry firearms going forward. That may be a law with which we, you know, wouldn't take the same Second Amendment issue. I don't think you can kind of read that into this particular law, but I think that – I just want to follow your concept of facial challenge. So if this one had said for those people some sort of finding of special danger of misuse, they need $300,000 insurance, everyone else $10,000, then maybe your challenge would be cabined to the 10,000 people. Probably, just given the nature of the people I'm representing in this case, that would be the focus of our challenge would have been to say, okay, if you've got two applications, we're going to challenge – you've got two provisions of the statute, we're challenging the provision that's relevant to my plaintiffs, and we're not here to challenge the provision that would deal with people who have engaged in misconduct and have presented a credible threat of fear to another. I think that gets to the core point of our challenge, which is that it's one thing to have those types of restrictions if somebody has engaged in misconduct, but as a historical basis, there's just no tradition that says that we're going to treat anybody who wants to exercise their rights the same way we would as somebody who has been found to pose a credible threat of fear to others. Thank you, Counsel. We'll hear from the Coons plaintiffs now. Thank you, Your Honor. Pete Patterson for the Coons plaintiffs. We do take a little bit of a different approach than the Siegel plaintiffs in terms of the key principle here, and so if I could, I would like to say why we think security is the key for sensitive places and places frequented by the general public and for four reasons, if I could quickly. One, Bruin said we can analogize to the founding era legislatures, polling places, and courthouses, and we have to look at how and why. And as we've shown, those were all secure locations, so as to the how. Second, as to the why, as the Siegel plaintiffs indicated, there may be many reasons why a place is sensitive, but the key distinguishing factor of them is that they're secure. That's the way to tell whether they actually are sensitive. Does that apply to schools, too, in your view? I'm talking here about places that are frequented by the general public. Schools are generally not open to the general public. They are typically the kids are under in loco parentis authority of the school, and so we could have a discussion about the history around the school, but that's a different category. And so in terms of the places we're talking about, if it truly is the exceptional type of place that Bruin talks about, the government will be compelled to secure it wholly independent of Second Amendment reasons. This is places like nuclear power plants, places like commercial airliners. It's not sensitive because it's secured. It's secured because it's sensitive. The government will do it anyway. Third and relatedly, it's judicially administrable. In case a place is open to the public, the basic rule is if a criminal can freely go into the place with a firearm undetected, I have the right then to go in as a law-abiding citizen with a firearm to defend myself. And fourth and relatedly, it's the principle that's consistent with the principles underlying the Second Amendment, which Rahimi says we are to look to, and that is that I have an individual right to self-defense. If the government is not handling self-defense itself by ensuring that bad actors are not going to be in a place with a firearm, I have a right to defend myself with a firearm in that place. I'm not sure that works for polling places. Plenty of them don't have security. Well, what Bruin said is we analogize to founding era polling places, and founding era polling places it did because there was not a secret ballot. And so there was a fundamental change in polling places when the secret ballot came into place, and all of a sudden the concerns about intimidation weren't there. So for analogizing to founding era polling places, it's completely consistent with the theory. And this is consistent with Bruin itself, which said that things can move in and out of categories based on different facts in the ground. It said, for example, handguns may have been dangerous and unusual at the founding or during colonial times and therefore could have been banned, but they no longer are. And I also would like to address this issue about silence versus contradiction. This is not a case of – Before you get there, because you have very little time. Yes, yes. Is it your position that reconstruction era evidence taken alone can never establish a historical tradition, and if so, why? Correct, because it is far removed from the founding. The Supreme Court has been very clear that it can be confirmatory. It cannot establish the tradition itself, and that's true whether it's 1791 or 1868 because the tradition would have had to have been in place at that time, not after. How do you reconcile that with a new societal issue that arises post-1791? Yes. You have to take the principles of – So are you saying that the legislature – I think Judge Kress was talking, either you or your advisor about this, their co-counsel, rather – that the legislature can't address a new social problem? It can address it using the principles that were in place at the founding. And so here, again, there's not silence at the founding. There's a hundreds-of-years-long tradition of banning only terrifying carry at places of public congregation like fairs and markets. And so the legislature can take that tradition and say, if we have a new problem, we can ban terrifying carry in a new sort of place. What you can't do is move beyond the tradition. And these also aren't new places. They were places of literary educational gathering in the colonial and founding era times. A key place is churches where people were vulnerable during colonial times. The whole community was gathered. And what do we see? The legislature has either freely allowed carry or required it. And so the analogous restriction here would be, okay, say we've got a sensitive place where we're having a lot of problems. Everybody with a carry permit, you have to carry your firearm to that location because we can't secure that place but we're relying on you, the people who are protected by the Second Amendment, to exercise your rights to carry firearms in those locations. Counsel, Judge Krauss mentioned the four circuit courts that go the other way, and I was interested to see how the district courts in Hawaii and California and New York largely supported your position. I'm interested to hear if you can explain to us what move the circuit courts made in your view that was wrong and what move or moves the district courts made in those cases that were correct. Is there a way to sort of synthesize what went wrong in those cases from your perspective? Yeah, I think it's clear what went wrong is just improper and too loose historical analysis. And they tend to center around things like whether a place is crowded, whether there are vulnerable people there, or whether there are other constitutionally protected activities taking place in the location. But it's wholly unsupported historically that you can ban firearms in those sorts of locations because, again, the history shows only terrorizing. Was it wholly unsupported historically or just unsupported relevantly historically? Unsupported relevantly historically. And so, yes, there are some outliers. However, this case is going to turn on whether we're looking at the 1880s and beyond or focused on founding era. Correct. Well, even as of 1868, again, there was nothing. But also there's misinterpretation of founding era evidence such as the Afrae laws, which only restricted, again, terrifying carry. They did not restrict peaceable carry. If there are a lot of laws in the 1870s and 80s and so on, yielded age, and you don't find such laws around the ratification era, is that an inconsistency or is it just irrelevant because, well, those states could have regulated more aggressively than they did. But they didn't. But that doesn't mean it's inconsistent with the later. It is inconsistent because we have the Second Amendment at the founding. Even if there is a silence, that creates a presumption that people have a right to carry. The state has the burden to come forward with a tradition of regulation. Nothing is not a tradition of regulation. So then states coming in is an inconsistency. But even if the Supreme Court in Espinoza said more than 30 state laws from the late 18th, 19th century cannot create an early American tradition. And so here you've got four and three territories. So if more than 30 cannot create an early American tradition, it's clear that the four that you've got here that are outliers, geographically concentrated, and states, again, as the Supreme Court has pointed out, did not have a proper understanding of the Second Amendment. How do we reconcile that with Bruin's brief discussion of sensitive places where they said in the 18th and 19th centuries together, there were relatively few restrictions in these sensitive places that are listed, but they said courts can use analogies to those historical regulations. That was enough. Well, again, the later evidence can be confirmatory of what was in place at the founding. So if it's there at 1791, you can say, and then that tradition continued on. But I guess my specific question is that they say there are very few sensitive places where weapons were altogether prohibited. There are very few examples. And then they cite a law review article, and basically there are a couple. They want one or two examples of banning carry in legislative assemblies and courthouses. And they said, but that's enough for us. So why do we now need many more than that? Well, because – so here's a distinction between an analog that you look at and the broader tradition that is establishing the historical practice. And so the Supreme Court has said you need a well-established and representative analog, but it's not the analog that is establishing the historical practice. In terms of the sensitive places, the affray tradition, again, which was a hundreds-of-year-long tradition, that said generally in places frequented by the general public, only terrifying carry was banned. But then as we see in the 1786 Virginia statute, which codified the common law, the Supreme Court said that in Bruin, the first half of it said that nobody can carry in courts – this is exceptionally sensitive place – except for the justices and those assisting them. So it shows this tradition at the founding – again, this is a background, codifying the common law, something that's generally applicable across the states, the colonies – that arms could be barred in highly sensitive places that the government secured. But the North Carolina one in 1792 is exactly the same as Northampton. There was no 1792 North Carolina statute. That was in a private lawyer's collection of the laws he posited, the British laws he posited, that were still in effect in North Carolina. So that was not – North Carolina did not pass a statute in 1792 referencing the king. That was just a private lawyer like one of us, you or me, writing a commentary and saying, we think these are the British laws that are still in effect in North Carolina, and he included that one. And there is a later – My question is, though, would that not suggest it's part of the common understanding at the time? Yes, and that is exactly the same – the North Carolina Supreme Court in 1847 interpreted this tradition. It said there's this debate about whether the statute is still in effect or not. It doesn't matter. It just codified the common law, and what the common law said is, in places frequented by the general public like fairs and markets, only terrifying carry is banned. Peaceable carry was always allowed. Well, your time is up. Could I just ask you one thing? If you could just very briefly respond to – my sister, Judge Schwartz here, asked about irreparable harm with respect to the insurance regulation and the VTCO. Do you have a response to what your friend across the aisle said? Well, I'm going to adopt my reference here because we don't have an insurance claim. In this case, we're only focused on the sensitive case. Okay. All right. Thank you, counsel. Thank you. And we'll hear rebuttal from the State. In order for plaintiffs to be correct, your honors must believe that Heller and Bruin and McDonald all got it wrong. Both sets of plaintiffs twist themselves into knots, trying out theories that are totally unsupported by history and instead are based on their own freewheeling means and scrutiny analysis. What history? Can you address my question to Mr. Patterson about what's relevant history? You've got history, but is it relevant? Because it's too late. In other words, doesn't this case turn on whether we focus on founding era and the few decades after the founding or we focus on reconstruction era and the few decades after reconstruction? I think this court does not need to reach the question that it did reach in Lara because in Lara, this court found that there was contrary affirmative evidence from the founding in the form of the 1782 militia laws that then contradicted later evidence. You do not have that here. There is no evidence from the founding or from any of the decades following the founding that sensitive place restrictions were unconstitutional. But where does the tradition start from your perspective? I think the tradition certainly starts with the statute of Northampton, which was— Well, let's set that aside because the Supreme Court didn't really lean into that in Heller. You'd agree, right? And the dissent leaned into it in Heller. I think that is true and we accept that for the purposes of the Afray clause, but that is just a separate clause. All right, so let's just set aside the British history. Let's focus on founding era. Where do you pin the tradition starting in founding era? So you have the few laws that the court in Heller cited for the polling place restriction, which was just in Delaware as far as we're aware. They've conceded polling places. They've conceded schools. They've conceded legislatures and courts. If we're talking sensitive places, those are agreed upon. I'm not so sure they have, actually, from what I've heard from my friends on the other side, but I can come back to that later. You start with other jurisdictions that started enacting sensitive place restrictions, New Orleans and ballrooms in 1817. Parks, as soon as Central Park and parks like that came to be in the 1850s, just about every— All right, so let me just press you on that a little bit. You said 1817, then you said 1850s. You've got one New Orleans law from 1817, and then you go right to 1850s. Do you have anything else closer to 1800? So in terms of the statutes that we're looking at, no, Your Honor, but I think the reason is because legislatures just chose not to regulate. All right, so— And that includes places that didn't have Second Amendment components. All right, so you're falling back on, I think Justice Barrett has written about this, that it's whether or not—we shouldn't assume the legislature maximally exercises power. That's right. That really has to be the focus of your argument if all you have is one 1817 law, and then you go to 1850s. I have one more gloss in addition to that, which is not just that not every legislature is always maximally regulating, but then you see legislatures choosing to go up to the max in some places and not in others. And I think that kind of heterogeneity in policy decisions across the states, including decisions by legislatures that were bound by an individual right to bear arms under state constitutions, choosing those very policies, I think that is really, really relevant. It's not just like we always have silence and we have nothing to show for it. We have a tradition of states that were bound by their individual right to bear arms and choosing these particular policies, and then courts that were cited by Heller and Bruin approvingly actually upholding those laws. I think that is a very different set of facts than what you have in Espinoza, for example, where you have contrary earlier evidence about the limitations and the interplay between the Establishment Clause and the Free Exercise Clause that was contradicting later evidence. You do not have that here. And if we're plaintiffs to be right, that means a very extreme version of constitutionalizing every policy choice, which is antithetical to federalism. But in order for them to be right, going back to my other point about polling places in schools, I'm sorry, I already jumped. I'd just like to weave in a thought that you had in response to Judge Krause's question on your initial argument, where you said, hey, if we use 1791, then we've got a real problem because there's no basis for, there's no historical regulation of courthouses in schools. But how do you reconcile that with this kind of use it or lose it theory that you don't always have to maximally regulate? But would it be possible to look at 1791 and say the absence of regulation in schools and courthouses is a situation in which we say that wasn't maximal regulation? Or do you say, no, this is a case where we can view the fact that there weren't regulations in those spaces as indicative of that's actually the talk, that's the ceiling? What do you say to that? So I agree with what Your Honor was saying earlier, that the fact that legislatures did not choose to regulate schools and courthouses at the founding, you can't read into that that they were restrained by the Second Amendment. Because if that were true, first of all, that doesn't make sense because many of those legislatures were not bound by the Second Amendment or any state version thereof. So it would make no sense to say, oh, they must have been making that decision in Delaware because Delaware was not bound by it. So the same has to apply for states that were bound by the Second Amendment. Did we take that into account, that when legislatures legislate, they're not bound by the Second Amendment or maybe Second Amendment? It was a thought that occurred to me as I was reading your theory. But it's relevant, right? I think it's relevant as a counterpoint to their theory. Now, I don't think that's what Bruin was looking at because they cited... Is it relevant when we're doing Bruin and Rahimi type analysis and trying to find a national historical regulatory tradition? So what I'm suggesting is that in response to the other side's argument that silence must mean the Constitution pervaded, that doesn't make sense. I get it. What about my question? I don't think that Bruin and Rahimi were looking to that methodology because they did not square the citations of the state laws that they were looking at with states that had or didn't have the Second Amendment. So I don't... Can we do that? I think that would be... Should we do it? I don't think that contrapositive is correct because just because a state had the Second Amendment doesn't mean that they were always legislating or that was always the barrier. And, in fact, in this case, you can look at states like Tennessee and Missouri, which did have that barrier and yet still found these to be constitutional. Your time is up, counsel. Thank you. Thank you. Thank you.